The first case for today is 2017-60241, In-N-Out Burger v. National Labor Relations Board. You may proceed when ready. Good morning, Your Honors. Bruce Sarche with Littler Mendelsohn on behalf of petitioner In-N-Out Burger. I wish we could all take a field trip right now to In-N-Out. What would we see there? We would see our sparkling, clean restaurant. And we'd see our associates in their uniforms, much as the images before you all this morning. So what we see would be more important than what we eat at In-N-Out Burger? Well, if you're an associate, in your very first day on the job, you get some computer-based training. And in that training, you are told our image of professionalism and what the customer sees is just as important to us as the food we serve. And that word, image, has been in that training module for decades, long before anybody at the company knew there was a public image prong of the special circumstances doctrine. So we'd see the associates busily preparing their food. And it's kind of a retro look. It's kind of a retro look. It's been the same for many years. It hasn't changed in over 60 to 70 years, yes, ma'am. So, and it's fairly strict. It's, you know, for example, if I'm wearing nail polish, I wouldn't be allowed to be there. Is that right? That's correct. Okay. Go ahead. But I'm concerned, though, about the standard of review. The standard of review, certainly. It's the National Labor Relations Board. So with regard to their findings of fact, this court owes deference to those findings. If they are supported by substantial evidence, even if they haven't shown it by a preponderance of the evidence, then this court owes deference to those factual findings. Example, the judge in this case concluded that basically all areas of our restaurants are open to public view. There are no non-public areas. That finding was supported by substantial evidence. And, indeed, the board has not challenged that finding on appeal here today. But the conclusions of law require a balancing of the interests of the parties. And the ultimate conclusion of law here is that the rights of associates to add message items to their uniform is superior to in-and-outs right to maintain and project a public image and to maintain and preserve the safety of the food they serve. This is a balancing between the interests of the workers and the company. It comes from the National Labor Relations Act itself. Now you're not talking about the standard of review, are you? Excuse me? You're not talking now about the standard of review, are you? Yes, so I am. So that is a de novo standard. When you're looking at the balancing, this court looks at the conclusion of law. What's that balancing? How does it turn out in the end? Do the Section 7 rights of the workers prevail, or does the right of the employer to maintain discipline in the workplace prevail? That's a conclusion of law, and this court reviews those findings de novo. So are there clearly erroneous type factual findings, things that are not supported by substantial evidence, I guess I would say? There's not much dispute about the fact. So it's really you think it's a dispute about the balancing. Exactly. There's not much factual dispute in this case. Do you have a factual dispute about anything? Let's see. Off the top of my head, I can't really think of one that stands out. The Board doesn't disagree that we've got a business plan, that we've established a public image, and that as part of that business plan we have this strict uniform policy. Then we get to the sort of fourth prong of the standard, which is does allowing associates to add items to their uniform unreasonably interfere with our public image? And that's really where the balancing comes in. You didn't make an issue before the Board about the content of the message. Yes, we did. It's briefed to the Board. The image of the clenched fist and the fight for 15, we did make an argument about the content of the message. I didn't read your brief as putting any emphasis on that, that what you objected to was the message. We do object to the content of the message as well. But if you study these special circumstances cases, you'll see they kind of fall into various categories, and many of them are decided without even looking at the public image of the business. They just really focus on the message. So you go into a grocery store and you're going to buy, you're going to the butcher counter and the button says, Don't cheat about the meat. Well, the Board didn't really look at the image that that store was trying to project. They sort of took a shortcut and said, That message is ambiguous. Customers won't know how to react to it. And so, therefore, the employer was allowed to say, No, you can't wear that Don't Cheat About the Meat button at our butcher counter. Here, the image is one of a clenched fist, and it also implicates the fight for 15 movement. There's evidence on the record that In-N-Out, as part of its image, as part of its business plan, has always paid substantially more than the minimum wage. So we think the clenched fist image presents an ambiguous message and would tend to alienate customers. Those are two standards that have been used in the Noah's Bagels case and in the Pathmark Stores case. Did you argue to the Board, though, that because it's like a clenched fist and that's a hostile, but it's hostile maybe in conjunction with the child abuse button that you have in April, that you can't have the child abuse button and also have clenched fist button at the same time? Was that argument made? We argued extensively about the company-provided buttons, yes. But in the context of clenched fist, did you present any argument about that? Not in conjunction with what the company buttons provide, no. But you're not standing there saying that if the button had just said, Fight for 15 and had no image on it other than the words Fight for 15 at the button. Understand? No. Let me finish my question. What it had on there was a clenched fist and Fight for 15. Is that right? Right. I'm asking you whether or not if it didn't have the clenched fist and just had the words Fight for 15, are you telling me the company then would not have found it objectionable? It still would have found it objectionable. All right. So the clenched fist doesn't matter with regard to your argument now, does it? It can. It can be an alternate track. We can argue both ways. But we do have a blanket ban. We do have a blanket ban, and those have been upheld by the NLRB in similar situations. What relief are you seeking? Are you seeking relief that we say that the blanket ban is satisfactory, or are you seeking that it's okay to ban this button? We are seeking that determination by this court that our work rule that bans associates from adding anything to their uniform does not violate Section 7 of the National Labor Relations Act, regardless of the message on the uniform. Okay. But there's no middle ground? You're not seeking some alternative relief? It's only the staked out position? We believe the standard allows for a complete ban. If you look at footnote 6 of the Bosch-Honda decision, they're discussing what happened at the W. San Diego Hotel, and they said if an employer has a strict uniform policy and it's designed to create a specific and unique environment. I don't understand your argument that the facts here are indistinguishable from the facts in W. San Diego Hotel. That's your argument, right? Well, there is one distinction, the size of the button. The size of the button was bigger in the W. San Diego case. Other than that, virtually indistinguishable. But the W. San Diego Hotel, they said they were trying to create this wonderland for the guests at the hotel that when they came in, it's like you're being transported to some different place. Yeah. Isn't that right? That word is in that decision. And at a hotel where you're coming into a private room, that arguably is that guest's private space. Isn't that right? Yes, but there are other public areas of the hotel as well. You check in, there's a lobby, there's a valet pickup for your car. These rules apply to all areas of the hotel. But In-N-Out Burger is not trying to create an experience for a customer at In-N-Out Burger, which approximates the experience of a guest at a W. Hotel. We submit that they are. Same thing. If you look at Conway Transportation, you look at their business plan and what was found to find and support special circumstances there, you'll see that their business plan was, we want to be a professional delivery company. We want our drivers to look uniformed and look the same. We want our packages to be delivered. So you agree with me that under Section 7, the law is clear that there are some buttons and pins that employees can't wear. You agree that that's what Section 7 provides? The case law. The case law has interpreted Section 7. That those rules are presumptively invalid. That our rule is presumptively invalid. We have the burden of proving special circumstances. All right. And what are your special circumstances? That we have the sparkling clean restaurant. That we've established a distinct and unique public identity from other quick service restaurants. So sparkling clean, though, in this context, you're not saying it's just not dirty. You're saying that it's got this kind of retro, there aren't tattoos. It's not a modern day looking place. It's not just clean like sparkling. It's not easy to maintain white uniforms in this environment. Most of our competition has gone to darker uniforms. We stick with the white uniforms because they help to display that image. I have to say, you're not the only restaurant or place that features white uniforms. I mean, that's a pretty standard deal. So the question could then be, do they all have a strict uniform policy, which is part of the public image that they're trying to promote. So if they're a white uniform and a strict uniform policy, then Section 7 is inapplicable. In each case, as fact specific, you have to look at the totality of the circumstances. So, yeah, we can cherry pick and find little distinctions and differences between a hypothetical restaurant over here and in and out. So your special circumstances are, one, you're sparkling clean. Yes. You got another special circumstance? That's basically it. That's the image that we present to the public. We are different from other quick service restaurants. We've always paid more than minimum wage. All of our managers are home grown. All of our food is fresh, never frozen. All of these things are in the public consciousness and help create this public image that we present. So is there evidence in the record that the hamburger industry is very competitive and that people are seeking out different distinctions? Would I find that in this record? We didn't put on an expert witness to testify to that, no. You didn't? I'm sure it's pretty— So do you have evidence in the record that this white uniform issue, that Burger King and Wendy's and McDonald's and all of the hamburger places that we could think of, Smashburger and I could name a whole bunch of other ones, that none of them have these white uniforms and this sparkling thing? There's no evidence in the record of that. But I don't think that makes a difference. If you look at Conway Transportation and you read their basic— Conway Central Express, I'm sorry— and you read their basic business plan, it doesn't say anything about a wonderland. It says basically that they want to achieve the same sort of things that other delivery companies want to achieve. Yeah, all fast food restaurants want to be clean. They want to be consistent. But that doesn't dilute the fact that we've proven special circumstances here. We are different. We are unique. If we've got a strict uniform policy and it's designed to create a specific and unique environment, that's what the NLRB has said we need to show. They don't say we need to show a wonderland. Again, look at Bosch Honda, footnote six, specific and unique environment and a strict uniform policy. Are you challenging the scope of the injunction, the ban? Like this was in Austin. Are you challenging anything about the scope of it or not? One of the key parts of our business plan is consistency from one store to the next. So what happens at one store happens at all. Are you saying in response to your 28 J letters that have been filed recently that you think this should be remanded to be looked at again in light of some new authorities that have come down recently? I don't think so, no. The 28 J letters were for the edification of the court that this is a time of change at the National Labor Relations Board and there's some great dicta in that Boeing case that goes here. But you're not asking us to take it back? No. Okay. Because we're getting a lot of those in these agency cases. Yes. The Grill Concepts case, which has been sort of a sister case, it's sort of grown up with this, has been remanded from the D.C. Circuit back to the Board. But they had a whole bunch of other stuff going on in that case. Is there something else you want to tell us in support of your case? Well, Medco Health Solutions 2 is kind of a curveball that the Board has thrown at us here at the last minute, and this is creating sort of an impossible, unworkable standard. They say that we have to provide specific, non-speculative evidence that an image would affect or has affected our business. And Medco is actually the case that's cited most frequently in the Board's brief to this court. And we think this is just an impossible and unworkable standard. It shouldn't have been adopted by the Board. It shouldn't be utilized by this court. It's a simple two-part analysis. Do we have a strict uniform policy and a specific and unique environment? We think that we have shown by... So, I mean, if this is successful, it's a path to riches because, you know, that's going to be everybody's pitch. There's nothing unique about what it is you're telling us. I mean, your company is not distinguishable from other companies in the fast food business. Well, I submit to you that Conway Central Express wasn't distinguishable from other delivery companies. I don't think that that has to be... So if we just pick the two or three key features that you have been promoting with respect to your client, what they promote, then Section 7 pins are out. In the work environment, yes, you can have a total ban. Special circumstances do allow that to happen. It's not a per se right that employees have to add message items to their uniform. It's not a per se right. There's a balancing that must go on. The special circumstances doctrine exists for a reason. So we ask that this court allow the work rule to stand. I mean, if you really focus on the size of the button as well, you'll see kind of that the result here could be a little bit absurd because in W San Diego, their button that was worn to the hotel was larger than the button at issue here, and their total ban is allowed to stand. Our button that was worn in here is a little bit smaller, and also this puts us in a catch-22 because a smaller button may have less impact on public image, but it's more dangerous for food safety. A smaller button is more likely to fall off, more likely to not be noticed if it gets into food. A larger button, not so much. So it kind of puts us in a catch-22. This isn't just a special circumstances case. We're talking about food safety here as well. But you would still have authority to limit particular buttons that were giant or that were not well clasped. Yeah, you kind of fall into what I would call the Lutheran heritage trap there, though. If you look at that Medco II solutions of Las Vegas case, they tried to ban provocative, insulting, or confrontational buttons, messages in the workplace, and the board said, ah, you've got a Lutheran heritage problem. Now that's on remand, but with Boeing in the works, it's up in the air. But this idea that you narrowly tailor and you write a work rule to meet these circumstances, yes, it could be done, but we submit that it doesn't need to be done in these circumstances. But if we rule against you, you're not going to say you can't try to do that? Excuse me? If we were to rule against you, assuming arguendo, not foreshadowing, you're not going to not try to do that because it's difficult? No, we'll try to do it. We'll try to comply with the law, and we always do. Thank you. Your time has expired. You've saved time for rebuttal. I notice you have a little pin on. Yes, Your Honor. You wouldn't be able to wear that if you were working in his restaurant. Well, I might be able to because this is actually an NLRB pin, so it might be considered a company pin, agency pin, if you will. Yeah. Is it well-clasped? It depends on who you ask, huh? I ran it by an administrative law judge, and he assured me it was at least as safe as the Merry Christmas button. Well, that's a good question. Let's start there. Why does the administrative law judge have better – in a better position to make a decision about whether something's a safe button than the company? That seemed to be a unique feature of the administrative law judge's decision. Your Honor, the administrative law judge was not faced with a dispute about a high-tech piece of machinery and whether that was safe or less safe than a previous technology that had been used. He was looking at a button, and he was looking at another button. The company button, if you look at the back of that button, the company describes it beautifully in its briefing. But if you look at it, it looks like a safety pin to me. That's a button pin with a safety pin. And the administrative law judge looked at that button. He looked at the 15 button. He decided there's no apparent significant difference in the safety of the two. What authority says the administrative law judge gets to decide without reference to the company's thoughts on whether the button is as safe as the other, just by eyeballing it? There are different clasps on the buttons, and the administrative law judge is saying, well, I don't think it's less safe. What kind of expertise does the administrative law judge have in safety of buttons? Well, Judge Elrod, I'm glad you raised this question. This is a specific question in the briefs. I'm glad you raised this question because at the hearing, before the administrative law judge, the judge explicitly said, company, if you want to put on expert testimony about this button and how it's constructed, you are free to do so. The company did not avail itself of that opportunity. So what was in the record, what was in the record? Didn't they have the company person, though, who had given testimony that it was not safe and could come off? I thought they had the company person who gave the testimony. He testified to that, and he's at least in that industry. I agree in two out of three parts. I agree there was a witness. I agree that he testified. I do not agree that he testified to any significant content about the 15 button. In fact, that witness, who was Vice President Lange, had never seen the button before the hearing. He said, on the record, this is the first time I'm seeing it. He was not an expert on the button. I'm sorry, it may not have been Lange. Actually, I believe it was probably Palmini, if not Palmini Moore, who were at the store level. Now, they had seen not General Counsel Exhibit 2. They had seen Employee Brad Crowder wear a different button. But as the Board's decision shows, they never inspected it to determine if it was an unsafe button. They just said, oh, that runs afoul of our policy, and we're going to make you take it off. Is the issue that it's a fist before us, that it's a fist rather than just words, is that properly before us to consider in the grand scheme of things? Short answer, no. But that depends in parts. Part of it is not. Part of it might be, but that depends on how strict this Court's waiver rules are, and you know that better than me. And I do want to address that in my argument. But if you'll indulge me, at this point I would like to step back a minute and explain to you why it is that I am here before you. I am here to seek the enforcement of In-N-Out Burger employees' Section 7 rights, their rights under the National Labor Relations Act. Section 7 guarantees employees' right to self-organization and to engage in concerted activity for their mutual aid and protection. These rights depend on communication. They depend on employees' freedom to communicate in the workplace with each other about self-organization, about their terms and conditions of employment, about unions, and about what they might want to do differently in the workplace if they had the power to achieve it. Communication and the freedom of employees to communicate is the lifeblood of Section 7. For employees to be able to take the concept of self-organization and turn that concept into a reality, they must be able to communicate with each other at the workplace. Now, employees must not only be able to exchange information with each other. They must also be able to inspire each other, inspire each other to do something differently, to change the status quo in the workplace. What authority says this inspiration is part of the Section 7 right? Your Honor, I would point you to this very case. Here, we had three In-N-Out Burger employees at a restaurant in Austin. No, I'm not asking for it. I'm talking about pre-existing authority that says inspiration is a stated Section 7 value that you just told us about. I'm not asking how does that apply here. I'm asking, you just defined Section 7 rights very broadly in this kind of ethereal, inspirational thing. Where does it say that that's part of the right? Your Honor, I would, in the first instance, refer the court to the D.C. Circuit's decision in Healthbridge that is cited in the briefs. And they say it's an inspirational, bright? I don't believe they use those exact words. This is an advocacy issue, isn't it? I mean, we're advocating for $15 an hour. I don't know what they pay in this restaurant, but I mean, this business. But this is an advocacy issue with respect to their hourly rate. I mean, that's sort of right at the center of what an employee is interested in. That's right. I'm getting paid $8.50 an hour. I'm for $15, and I might be willing to settle for $12, but let's go for $15. You know, that's where I'm advocating for higher pay. Isn't that what this is about? That is what this is about. Which is different than inspiration and motivation and all this other. Well, it's motivational. But it's advocacy. Well, I understand I haven't substantiated that point yet, but I promise to do so. Do you want to, or do you want to just move on to something else? I would like to move on, but to explain exactly what the concerted activity in this case was. I want to suggest that you could possibly prevail in your argument without any mention of inspiration. But when you start talking about inspiration and all of that, my recommendation is you either need to cite some case authority, or you probably need to move on in the argument. Point taken. All right. Now, here we had three employees at an In-N-Out Burger restaurant in Austin, Texas. They wanted to exercise their Section 7 rights by wearing a pin, supporting a movement, to increase the minimum wage to $15 an hour. Now, it wasn't all these employees doing it all at once. We started with one employee. Her name was Amanda Healy, and she came into work on one day in April wearing a button. That is the button that you have in the record before you. During that day when she wore it, it was a six-hour shift. Two people talked to her about the button. Neither of them were customers. Neither of them were supervisors. They were two of her colleagues. I'm just concerned your time is running out. Is there something about this? I don't think there's a factual dispute about that they were told not to wear the buttons. Make it really quick. One of the employees who spoke to her was David Nevels, and he, on the very next day, asked his manager if he could wear a button too. And then a third employee, on another day, wanted to wear it. But at that point, the employer cracked down. The employer told David Nevels that button was not part of the uniform. The employer instructed Crowder to take the button off. And Healy testified that after hearing about the Crowder incident, she didn't wear the button. There's a dispute. The employees want to wear the buttons. The bosses don't want to let them. We've got that. All right. So I'll get more into the weeds here. To start, I want to speak briefly about the standard of review. Your Honor, de novo review is totally inapplicable to this case. There are three frameworks of review that are applicable here. Board's findings of fact are affirmed, supported by substantial evidence. The inferences the board draws from those facts are affirmed if plausible. And when the board applies law to fact and balances managerial rights against Section 7 rights, the balance the board strikes is affirmed if reasonable. There is no other standard that is required here. So the standard is the balancing reasonable, not whether we would make that balance. Is that correct? That's correct, Your Honor. And what is the best case for that articulation of the standard? My very best and favorite case for the general principle of deference would be the Supreme Court's opinion in Beth Israel. However, more closely on point are two decisions I cite in the standard of review section of the brief, which are this Court's cases. The name escapes me, but they stand for the proposition that this weighing is affirmed unless arbitrary or unreasonable. Okay. Now, with that, I'd like to turn to the burden of proof, because the employers made the contention here that the board applied some sort of new evidentiary standard, and that's just incorrect. As far back as 1970, and perhaps longer, the board has explicitly stated that vague general evidence is insufficient to establish special circumstances enough to outweigh employees' Section 7 rights. Now, although the company is wrong about the burden of proof, they are right about one thing in their brief, which is that the board isn't any more expert in the fast food industry than it is in hospital patient care. And that's precisely why the employer is in the best position to proffer evidence of the impact buttons and pins would have on its business. So say not just me, so says the Supreme Court in Beth Israel Hospital. Now, unless there are any questions about the standard of review or the burden of proof, I'd like to move right on to the public image defense. Well, I do want to ask a question about this decision, which is one of the most unique decisions that I've ever read, and perhaps you would even agree with that, that it's got all these footnotes where they're just claiming their agreement with the administrator, because the administrative law judge went considerably farther than any other one I've ever read, and expressing a lot of opinions about different things. You agree with that, right? It's a very interesting opinion. I believe footnote two of the board's order makes clear that they took some issue with the tone that the administrative judge. Not just the tone, but the random assertions here and there and kind of political points being made. That's right. That's correct. That's right, Your Honor. However, there was no disavowal of the critical analysis and the points of law and no disavowal of the judge's analysis distinguishing W Hotel from the instant case. I want to make that clear because the company argues to the contrary. Okay. So did the acting chairman disagree on any part of this decision? He disagreed on a small part of it. The board was unanimous in rejecting the special circumstances defense as applied to either the blanket ban or the button. The only thing that former chairman Miskimara dissented on is that he didn't think that this extra violation about telling employee Nevels that a button was part of the uniform, that that added anything. He thought it was cumulative and wouldn't add to the remedy. So that was really the extent of his dissent. Now, moving on to the public image defense, the test is not disputed here. What is disputed is whether the company has satisfied the requirements of that defense. And to explain why it hasn't, I want to break up the public image defense into essentially two buckets of proof that a company has to fill with evidence. The first is the image bucket. The company has to show that it has an image that it cultivated through appearance rules for its employees. There's no dispute here that In-N-Out Burger has an image that they cultivated through appearance rules for their employees. So there's no bucket one problem as such. What the company failed to do is to show how protected buttons, including the 515 button, would unreasonably interfere with that image. That is a fundamental problem in the case. And there are really two reasons why the judge and the board reasonably rejected the special circumstances defense. One, simply a lack of evidence. The company didn't really put up and explain why there would be an interference, and an interference so significant that it would outweigh employee statutory rights. The second problem. So did they argue anything about the fist being threatening? Not threatening, Your Honor. They argued to the board that the fist was contrary to the company's friendly image. Well, do you need an expert for that, or can you just say fist in people's faces is generally not considered friendly? You said they didn't put on actual evidence. I assume you mean like experts to say this. Did they need an expert, or is that a common sense conclusion you can draw? Well, I treat your questions in two parts. Do you need an expert on what a fist means? Probably not. Do you need an expert on what fist in face means? Definitely not. But here we don't have a fist in the face. We have a raised fist with the numbers 15 and a dollar sign. Now, the employer didn't put anything in the record that would make it reasonable to infer that employees would see this and say, oh, that's calling for fisticuffs. The fight for 15 is no more calling for violence than fight for better education would mean I'm going to go beat up a school principal. It's just an unreasonable inference. No, but it's a negative thing. It's a negative thing to have a fist, a fight. It's a negative. Whether you think it's a good cause or not, I'm not at all expressing anything on that. It's a negative thing to have a fist. A fist is not a happy face. It's a provocative thing, don't you, in any kind of way, even if it's in solidarity with a good thing. Your Honor, I would posit that's a very attenuated conclusion. And rather, the type of fist used here looks to me like the raised fist that, for more than 100 years, has been used by the labor movement as a symbol of solidarity and unity. Now, if the company wanted to say, no, no, no, this fist has a different meaning and it's associated with something really bad, they could have put on that evidence, but they did not. I don't need evidence if it's just because solidarity with the union is a good enough reason to have a fist. I mean, that's a positive image enough. Is that what your point is? Yes, Your Honor. Okay. What about are we allowed to consider the impact of the customers? Because some of the briefs say we are and some of them say we're not. The company, in its reply brief, argues that the 15 message is problematic because it implies false and misleading messages about the company's compensation philosophy. That is absolutely not before the court. No, just the general point that I don't want to go eat a hamburger at some place that's having a political discussion. I'm not saying that this is true for me. I'm just giving a hypothetical. You just want to eat your hamburger and not be confronted with some kind of political issue because it's so stressful these days with all these political issues. Can we consider the customer and would they have had to have evidence of that specifically? You can consider the customer, but they would have had to put on evidence. They didn't even argue that, did they? Did they argue that? Did they argue that there would be some negative impact on a customer who goes in there for a hamburger where somebody has a dime-sized button with a face on it? Oh, I don't want to eat here now. Did they even argue that? As far as political disagreement, no, and that's not properly before the court pursuant to Section 10. I thought that was in the brief, in the reply brief, but maybe that's not a proper argument because they didn't preserve that. May I answer the question? Yes, please. They made that argument for the first time in their reply brief, so, of course, it's waived. But more importantly, there's no jurisdiction to consider it because pursuant to Section 10E of the National Labor Relations Act, the court cannot address any objection that was not urged to the agency below, and that objection was not urged before the agency. Did you have some wrap-up sentence or something? I would like to wrap up. I want to come right back to where I started. For many years, employees have had a statutory right to wear adornments like a 15-button or union insignia at work. In the instant case, the board reasonably found that In-N-Out Burger employees could exercise that right. Thank you.  You have a rebuttal, counsel? Just a few points. On the fight for the increase in the minimum wage and Judge King's reference to maybe settling for $12, well, there is evidence in the record that at this store we were already paying our associates $12 an hour, and there's evidence in the record that In-N-Out has consistently paid more than minimum wage, distinguishing it from our competition. This is known to the public, and that leads the fight for 15-button in this context to be, we argue, ambiguous. Second, with regard to Acting Chairman Miscimarra's dissent, he does take issue in that super-long footnote about this whole question of the wonderland that the W. San Diego Hotel had to create, and he says that you don't really have to have something like that's specifically crazy, different, out of this world, that you don't have to have that to prove special circumstances. That going in to buy a hamburger where part of our business plan is to create this image can meet the special circumstances. Why didn't you put on evidence? Excuse me? Why didn't you put on evidence?  Of how unique and special and how different it is than other hamburger places. We did. There's evidence in the record. The menu never changes. You go to any other fast food place, they're adding chalupas, they're adding carved sandwiches. Our menu is always the same. Our associates wear white uniforms. All managers are homegrown. We pay more than the minimum wage. The image never changes, and the logo never changes, and there are just a number of distinguishers for in and out from other fast food service industry restaurants. The other point I'd like to make is, again, coming back to the size of the button. If you read these special circumstances cases, a lot of times that's in evidence and that's a consideration. But in this case, because we have both a food safety and a public image concern, I would submit that there's no such thing as the Goldilocks-sized button here. If you make it smaller, then it's going to be less likely to be noticed if it falls off the uniform and falls into food. That will diminish the impact on your public image, right? Because it's smaller, it's more innocuous, but it increases the risk of food contamination. The wrong argument is you had an opportunity to offer some evidence about the safety, and you offered none. You just argued, well, it's smaller and it could fall off. You could have called somebody and said, we've seen them fall off. It's happened before. These are not stable. You offered none of that, did you? Bob Lang's testimony, he does talk about items coming off and being Robert Lang, Jr., the vice president. He's an expert on? No, he's an expert on how you run a successful in and out franchise. He didn't offer any testimony about whether or not this button was any more or less safe than any of these other buttons, did he? He did. I mean, in terms of some expert, the weight needs to be this or the clasp needs to be one that you can screw on or safety, none of that. But if the board's ruling is allowed to stand here, the door is completely open. The scope of this order basically would allow associates to add anything to their uniform, stickers, insignias, any type of attachment. Put it here, here, here, here, here, anywhere they want to. And we have control over our uniform for an important reason, so that we know what the associates are wearing. We know what they're bringing into the food preparation areas. And if you open the door for any sort of insignia or any sort of button, we don't have that control over the safety of the food. Now, that's not accurate, is it? Because you can still argue that particular placement is more likely to fall in the burger, the soup, whatever. Saying that there can't be a blanket ban is not the same thing as saying you can't have reasonable regulations that you will articulate later if you lose your blanket ban. This is a fast-paced environment. We have associates moving from one station to the other, and we believe that the board owes deference to our judgment about what food safety requires, as they've displayed in other cases. Even if it's unsupported by any empirical evidence? Just the fact that you're introducing something into the food preparation area which we don't control. We're not responsible for it. We didn't construct it. We're not responsible for it. And you're saying let that into the food preparation area. Yes, that's what we're saying. Okay, I have one more question. Did you argue before the board that customers would be turned off and not come to the restaurant because of the buttons, the political nature of the buttons? There is a long line of cases that say actual harm to the customer need not be shown. So is the answer no? Eight of them cited in the record that the businessman is able to sort of predict. Is the answer no, you did not argue that to the board? That, I'm sorry, I lost the question. That the customer is going to be turned off and not want to eat at this restaurant because people are wearing political buttons. I think opposing counsel said it correctly. We argued that the clenched fist image was contrary to the friendly atmosphere that we're trying to portray. Thank you. Thank you, Your Honors. We have you.